IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

WILLIAM Q. DIESTA,    ) CIVIL NO. 15-00465 HG-KSC
           )
     Plaintiff, )
           )
   vs.      )
           )
CAROLYN W. COLVIN, Social )
Security Administration  )
Commissioner,     )
           )
     Defendant. )
_____ )

**ORDER AFFIRMING THE DECISION OF THE SOCIAL SECURITY
ADMINISTRATION COMMISSIONER**

This case involves the appeal of the Social Security Administration Commissioner's denial of Disability Insurance Benefits and Supplemental Security Income benefits to Plaintiff William Q. Diesta.

On February 6, 2013, Plaintiff filed an application for Disability Insurance Benefits and Supplemental Security Income pursuant to Titles II and XVI of the Social Security Act on the grounds that he has been disabled since he was in a car accident in December 2011 and hit his head on the steering wheel. Plaintiff was diagnosed at various points as having: degenerative disc disease, post-concussion syndrome, a history of viral bulbar myelopathy, and a cognitive disorder.  Plaintiff filed applications for Social Security benefits, claiming that his

conditions have prevented him from working since December 30, 2011.

The Social Security Administration denied his application. Following an administrative hearing, the Administrative Law Judge ("ALJ") held that Plaintiff was not disabled at any time from December 30, 2011 through the date of the ALJ's decision of August 1, 2014.  The Appeals Council denied Plaintiff's request for review and Plaintiff appealed to this Court.

The Court **AFFIRMS** the decision of the Social Security Administration Commissioner.

<u>**PROCEDURAL HISTORY**</u>

On February 25, 2013, Plaintiff William Q. Diesta filed an application for Disability Insurance Benefits with the Social Security Administration.  (Administrative Record ("AR") at 176-180, ECF No. 14).  On the same date, Plaintiff William Q. Diesta filed an application for Supplemental Security Income.  (AR at p. 169-175).

In May and November 2013, the Social Security Administration denied Plaintiff's initial applications and his requests for reconsideration.  (AR at pp. 118-122, 126-128, 129-131). Following the denial of Plaintiff's application, he sought a hearing before an Administrative Law Judge ("ALJ") and on May 20, 2014, an ALJ conducted a hearing on Plaintiff's applications.

(AR at pp. 29-53, 132-33).

On August 1, 2014, the ALJ issued a written decision denying Plaintiff's applications and Plaintiff sought review by the Appeals Council for the Social Security Administration.  (AR at pp. 8-28).  The Appeals Council denied further review of Plaintiff's applications on October 22, 2014, rendering the ALJ's decision as the final administrative decision by the Commissioner of Social Security.  (AR at pp. 1-7).

On November 5, 2015, Plaintiff sought judicial review of the Commissioner of Social Security's final decision to deny his applications for Disability Benefits and Supplemental Security Income in this Court pursuant to 42 U.S.C. § 405(g).  (Complaint for Review of Social Security Disability and Supplemental Security Income Benefits Determinations, ECF No. 1).

On February 29, 2016, the Magistrate Judge issued a briefing schedule.  (ECF No. 16).

On April 18, 2016, Plaintiff filed PLAINTIFF'S OPENING BRIEF.  (ECF No. 17).

On June 16, 2016, Defendant filed DEFENDANT'S MOTION FOR A FIRST EXTENSION OF 35 DAYS TO FILE THE ANSWERING BRIEF, which was granted.  (ECF Nos. 18, 19).

On July 25, 2016, Defendant filed DEFENDANT'S ANSWERING BRIEF.  (ECF No. 21).

On August 22, 2016, Plaintiff filed PLAINTIFF'S REPLY BRIEF.

3

(ECF No. 22).

On September 28, 2016, Defendant filed a letter requesting a continuance of the hearing date.  (ECF No. 23).

On September 29, 2016, the Court issued a Minute Order granting Defendant's request for a continuance.  (ECF No. 24).

On October 11, 2016, the Court held a hearing on Plaintiff's appeal of the decision of the Social Security Administration Commissioner.

**BACKGROUND**

Plaintiff is a 51 year old male.  (Administrative Record ("AR") at p. 54, ECF No. 14).  Plaintiff is homeless and lives in his car on the island of Oahu.  (Id. at p. 34).

On December 30, 2011, Plaintiff was in a car accident where he hit his head on the steering wheel.  (Id. at pp. 34, 38-39).

On February 6, 2013, Plaintiff filed applications for Disability Insurance benefits and for Supplemental Security Income, alleging that he has been disabled following the December 30, 2011 car accident.  (Id. at pp. 169-175).  Plaintiff claimed that he suffered from lightheadedness, headaches, and dizziness following the car accident, which have limited his ability to work.  (Id.)

Plaintiff's applications were denied and reconsideration was denied by the Social Security Administration.  Following Plaintiff's request, a hearing was held before an Administrative

4

Law Judge.

The Administrative Law Judge denied Plaintiff's application for Disability Insurance and Supplemental Security Income benefits. (Id. at pp. 22-23). The Administrative Law Judge found that although Plaintiff could not perform his previous work as a handyman, there was work that existed in significant numbers in the economy that Plaintiff could perform. (Id. at pp. 22-23).

The Administrative Law Judge relied on the testimony of a vocational expert to find that someone with Plaintiff's limitations could perform work as a Small-Products Assembler, Inspector, and Marker. (Id. at p. 22).

Plaintiff sought review of the Administrative Law Judge's decision with the Appeals Council, which denied Plaintiff's request for review and rendered a final administrative decision by the Commissioner of Social Security. (Id. at pp. 1-3).

**<u>STANDARD OF REVIEW</u>**

A claimant is disabled under the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); <u>see</u> 42 U.S.C. § 1382c(a)(3)(A); <u>Burch v. Barnhart</u>, 400 F.3d 676, 679 (9th Cir. 2005).

A decision by the Commissioner of Social Security must be affirmed by the District Court if it is based on proper legal standards and the findings are supported by substantial evidence on the record as a whole.  <u>See</u> 42 U.S.C. § 405(g); <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1039 (9th Cir. 1995).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>see also Tylitzki v. Shalala</u>, 999 F.2d 1411, 1413 (9th Cir. 1993).

## ANALYSIS

### I.   Plaintiff's History and Claimed Disability

The Administrative Record reflects that Plaintiff was born in the Kalihi neighborhood of Honolulu, on the island of Oahu, Hawaii, on March 30, 1965.  (Administrative Record ("AR") at pp. 54, 354, ECF No. 14).  Plaintiff graduated from Farrington High School in Honolulu in 1984.  (<u>Id.</u> at p. 354).

Between 2003 and 2010, Plaintiff had a steady work history as a self-employed handyman.  (<u>Id.</u> at pp. 35-38).  Plaintiff stated that he used to strip and wax floors, clean carpets, paint houses, do carpentry, and build countertops and cabinets.  (<u>Id.</u> at pp. 45-46).  Plaintiff testified that he stopped working in early 2011 due to lack of work.  (<u>Id.</u> at pp. 37-38).

On December 30, 2011, Plaintiff was in a car accident where he hit his head on the steering wheel.  (Id. at pp. 34, 38-39). Plaintiff filed his applications for disability with the Social Security Administration, claiming that he was unable to work following his December 2011 accident.  Plaintiff alleged he was disabled and unable to work due to the following conditions:

> I get dizzy spell, light headed, headaches, buzzing sound in my head when laying down from neck to the head moving, when I hear noise it echo in high pitch, I get tired fast, gotta go sleep, I can't held my head for long, irritated, get mad easily.

(Id. at p. 244).

Plaintiff stated that dizziness, lightheadedness, and severe headaches prevent him from concentrating and maintaining his balance.  (Id. at p. 41-44, 47-48).

Plaintiff is homeless and lives in his car in Honolulu. (Id. at p. 34).  Plaintiff stated that he is able to maintain an independent homeless lifestyle and has chosen not to live with family members.  (Id. at p. 48).  Plaintiff testified that he has headaches up to four times a day and takes several naps a day. (Id. at p. 41).  Plaintiff reported that he spends his time drinking coffee, reading the paper, doing crossword puzzles, going to sleep, and eating.  (Id. at p. 245).  Plaintiff stated that occasionally his children take him out to eat.  (Id. at p. 248).

Plaintiff testified that he can sit for a long time, stand

for ten minutes at a time, and walk for ten minutes at a time. (Id. at p. 42).  Plaintiff stated that he can lift "may five or ten pounds."  (Id. at p. 43).

Plaintiff is able to pay bills, count change, and use an EBT card to manage his finances.  (Id. at pp. 222, 247, 355). Plaintiff testified that he is able to perform independent tasks, perform personal care, obtain meals and feed himself, do laundry, take walks, and shop in stores.  (Id. at p. 43-44, 47).

## II.  Objective Medical Evidence

In 2001, Plaintiff was diagnosed with viral bulbar myelopathy,[1] which is an impairment to the nerve tissue in the brainstem.  (AR at pp. 330, 341-42, ECF No. 14); see Dorland's Illustrated Medical Dictionary 1167 (29th ed. 2000).  The viral bulbar myelopathy caused numbness on the right side of Plaintiff's face.  (AR at p. 342, ECF No. 14).  Plaintiff's facial numbness was resolved within the first year of treatment. (Id.)  Plaintiff did not report that his viral bulbar myelopathy interfered with his ability to work following the first year of treatment.

---

[1] Viral bulbar myelopathy is a lesion on the nerve tissue surrounding that spinal cord that may cause facial numbness.  See Dorland's Illustrated Medical Dictionary 1167 (29th ed. 2000).

## A.    December 30, 2011 Car Accident

On December 30, 2011, Plaintiff was in a car accident and he went to the Kaiser Permanente Emergency Room.  (AR at p. 550, ECF No. 14).  The medical records from the visit stated that Plaintiff was rear ended while in a car that was stopped.  (Id.) Plaintiff did not lose consciousness from the accident, the vehicle was not overturned, the airbag was not deployed, and the windshield was in tact.  (Id.)

Plaintiff arrived at the ER as a walk-in with "moderate" head and neck pain.  (Id.)  Plaintiff's physical exam revealed he was "oriented to person, place and time.  He appears well-developed and well-nourished.  No distress."  (Id. at p. 551).  A computed tomography ("CT") scan of Plaintiff's head was performed that showed no abnormalities.  (Id. at p. 553).

## B.    Plaintiff's Medical Treatment Within a Year of the December 30, 2011 Accident

On January 3, 2012, at a follow-up appointment with General Practitioner Dr. Russell Tacata, Plaintiff was prescribed Vicodin and Motrin for his head and neck pain and he was referred to physical therapy and therapeutic massages for pain treatment. (AR at p. 474, ECF No. 14).

Plaintiff's physical therapist and chiropractor Dr. Eugene Kitts referred him to Y&M Radiology for a magnetic resonance

9

imaging ("MRI") of Plaintiff's neck and spine.  (Id. at p. 317).
The January 13, 2012 MRI demonstrated that Plaintiff had some
degeneration of the discs[2] in his spine and mild neural foraminal
stenosis.[3]  (Id. at pp. 318-319).

Plaintiff was also referred to Neurologist Dr. Thomas Drazin
for examination.  (Id. at p. 283).  On February 8, 2012, Dr.
Drazin examined Plaintiff and his MRI results and found that
Plaintiff suffered from moderate degenerative disc disease in his
spine but no herniation.  (Id. at p. 283).  Dr. Drazin concluded
that Plaintiff had post-concussive syndrome[4] headaches as a
result of the car accident and gave Plaintiff prescription
strength Naproxen for his headaches.  (Id. at p. 284).

On February 29, 2012, Dr. Drazin conducted a computed
tomography ("CT") of Plaintiff's head and neck.  The CT scan of
Plaintiff's head was "normal" and showed no serious
abnormalities.  (Id. at pp. 278-79, 285).  Dr. Drazin determined
that "[c]onservative treatment should be pursued" and that there

---

[2] Degenerative disc disease is a condition where the discs
in an individual's spine degenerate, or slowly break down, over
time.

[3] Neural forminal stenosis is the narrowing of the spacing
where the spinal nerves are located in the spinal column caused
by encroachment of the bone on the space. See Dorland's
Illustrated Medical Dictionary 1698 (29th ed. 2000).

[4] Post-concussion syndrom occurs after a blow to the head or
body.  Common symptoms including headaches. (Administrative
Record at p. 320, ECF No. 14).

was no need for "any type of cervical surgery." (AR at p. 285, ECF No. 14).

Plaintiff had therapeutic massages from January 2012 to March 2012 (id. at pp. 497-548) and went to physical therapy from December 2011 until July 2012. (Id. at pp. 491-495).

On July 9, 2012, Plaintiff visited Kaiser Permanente and seen by Dr. Hyewon Jun. (Id. at p. 338-39). Plaintiff complained of neck pain, headache, and dizziness. (Id. at p. 338). Dr. Jun conducted a neurological exam and found that the results were "normal," and that Plaintiff had a normal mental status and normal gait. (Id. at p. 339). Plaintiff was offered medication for his headache and neck pain, but he declined any medication. (Id.) Plaintiff was requested to have lab tests done but he declined. (Id. at p. 359).

On July 31, 2012, Plaintiff visited Kaiser Permanente again and was seen by Dr. Todd Devere. (Id. at p. 341). Dr. Devere conducted a neurological exam and concluded it was normal. (Id.) Dr. Devere stated that he explained to Plaintiff that post-concussion headaches can sometimes take a few months to improve and he "recommended a trial of nortriptyline, but [Plaintiff] prefers to avoid prescription medication." (Id.) Dr. Devere found that Plaintiff was "alert and well oriented with clear speech and normal language, attention" with normal gait. (Id. at p. 343).

11

### C.   Plaintiff's Medical Treatment More Than a Year After the December 30, 2011 Accident

About six months after Plaintiff's last appointment, on February 8, 2013, Plaintiff visited Kaiser Permanente and was seen by Dr. Robert Sanders for lightheadedness and dizziness. (AR at p. 351, ECF No. 14).  Dr. Sanders indicated that Plaintiff "was initially under the care of Dr. Devere who recommended some medications, patient did not want to take pills so he did not followup." (Id.)  Dr. Sanders found that Plaintiff was alert, oriented, with a normal mood, and thought content.  (Id. at p. 352).  Plaintiff was able to walk to the medical facility without issues.  (Id.)  Plaintiff refused lab work and further treatment. (Id.)  Dr. Sanders stated:

> [P]atient refused due to "I don't like needles".  I also offered normal saline to attempt to make patient feel better as well.  This too was refused.  We did discuss the possible chronicity of post concussive syndrome, possible need for additional imaging, and the importance of following up.  Dr. Devere in his prior note did comment that he thought nortriptyline might help this patient so I did encourage the patient to give it a try.

> (Id.)

Following his visit with Dr. Sanders, on February 20, 2013, Plaintiff visited Dr. Devere about his headaches and neck pain. (Id. at p. 345).  Dr. Devere determined that Plaintiff had chronic headaches "without migraine features." (Id.)  Dr. Devere prescribed nortriptyline for Plaintiff to take to treat his pain.

(AR at p. 345, ECF No. 14).  Dr. Devere also recommended a sleep study for Plaintiff.  (Id.)

Plaintiff had scheduled a follow-up appointment with Dr. Devere on March 22, 2013, but he did not show up for the appointment.  (Id. at p. 348).

On April 18, 2013, Plaintiff had another appointment with Dr. Devere.  (Id. at 361).  Plaintiff continued to complain of headaches.  (Id.)  Dr. Devere asked Plaintiff about any success he had with the nortriptyline but Plaintiff stated that he never tried it.  (Id.)  Dr. Devere again offered medication for Plaintiff but he refused.  (Id.)

Plaintiff was referred to Clinical Psychologist Dennis Donovan, Ph.D. to conduct a psychological evaluation of Plaintiff for his disability claims he filed with the Social Security Administration.  (Id. at p. 353).  The testing conducted by Dr. Donovan determined that Plaintiff scored a full scale IQ of 77, in the borderline range, and he performed poorly on supplementary memory tasks.  (Id. at pp. 356-357).

On October 10, 2013, Plaintiff was examined at Kaiser Permanente by Dr. Pamela Monzon.  (Id. at p. 367).  Plaintiff complained of jaw and chest pain.  (Id.)  Dr. Monzon wrote that there was no complaints of headaches or blurry vision.  (Id.)  Dr. Monzon provided Plaintiff with Ibuprofen.  (Id. at p. 369).  Dr. Monzon recommended lab testing but Plaintiff refused.  (Id.)

13

Plaintiff visited Dr. Devere against on February 26, 2014.

Dr. Devere stated as follows:

> [Plaintiff] has symptoms suspicious for obstructive
> sleep apnea as he is always tired, wakes up with severe
> headaches and has a hx of snoring.  He declines sleep
> study even though I explained risks of untreated
> obstructive sleep apnea that also could be a major
> factor contributing to headaches.  He also declines
> prescription medication for headache/neck pain (ie.
> nortriptyline) and declines physiatry referral for neck
> and possible trigger pt injections.  He has tried
> chiropractor, Physical therapy, naturopathic docs.

(AR at p. 427, ECF No. 14).

Two days later on February 28, 2014, Plaintiff was seen by
Dr. Hyewon Jun for his headaches and neck pain.  (Id. at p. 435).
Dr. Jun found that Plaintiff did not want any test "that involved
the hospital and hates lab draws.  He does not want any
medications from us."  (Id.)  Dr. Jun encouraged Plaintiff to
consider a sleep study and do blood tests.  (Id. at p. 436).

Plaintiff was referred to physical therapy as possible
treatment for his pain, but at his last appointment on March 27,
2014, he reported that he did "not feel like doing the
exercises."  (Id. at p. 451).

## III. Applicable Law

The Social Security Administration has implemented
regulations establishing when a person is disabled so as to be
entitled to benefits under the Social Security Act, 42 U.S.C. §§
423, 1382c.  The regulations establish a five-step sequential

14

evaluation process to determine if a claimant is disabled.  The
Commissioner of the Social Security Administration reviews a
disability claim for Supplemental Security Income by evaluating
the following:

    (1)    Is the claimant presently engaged in substantial
            gainful activity?  If so, the claimant is not
            disabled.  If not, proceed to step two.

    (2)    Is the claimant's alleged impairment sufficiently
            severe to limit his ability to work?  If not, the
            claimant is not disabled.  If so, proceed to step
            three.

    (3)    Does the claimant's impairment, or combination of
            impairments, meet or equal an impairment listed in
            20 C.F.R. Part 404, Subpart P, Appendix 1?  If so,
            the claimant is disabled.  If not, proceed to step
            four.

    (4)    Does the claimant possess the residual functional
            capacity to perform his past relevant work?  If
            so, the claimant is not disabled.  If not, proceed
            to step five.

    (5)    Does the claimant's residual functional capacity,
            when considered with the claimant's age,
            education, and work experience, allow him to
            adjust to other work that exists in significant
            numbers in the national economy?  If so, the
            claimant is not disabled.  If not, the claimant is
            disabled.

Stout v. Comm'r Soc. Sec. Admin., 454 F.3d 1050, 1052 (9th
Cir. 2006) (citing 20 C.F.R. §§ 404.1520; 416.920).

The claimant has the burden of proof at steps one through
four, and the Commissioner has the burden of proof at step five.
Bustamante v. Massanari, 262 F.3d 949, 953-54 (9th Cir. 2001).

IV.   **The Administrative Law Judge Reviewed Plaintiff's**
      **Application By Using the Five-Step Sequential Evaluation**

At the Plaintiff's May 20, 2014 administrative hearing, the
Administrative Law Judge ("ALJ") for the Social Security
Administration reviewed Plaintiff's claim by engaging in the
five-step sequential evaluation.

Both Parties agree that there were no errors by the ALJ in
the first four steps of the evaluation.

First, the ALJ determined that Plaintiff was not engaged in
substantial gainful activity since the date of his Applications
for Disability Insurance and Supplemental Security Income
benefits.  (AR at p. 15, ECF No. 14).

Second, the ALJ found that Plaintiff had the following
impairments that limited his ability to work: cervical spine
degenerative disc disease, post-concussion syndrome, remote
history of viral bulbar myelopathy, and a cognitive disorder.[5]
(Id. at pp. 15-21).

Third, the ALJ found that Plaintiff did not have an
impairment or combination of impairments that meets or medically
equals the severity of one of the listed impairments in 20 C.F.R.
Part 404, Subpart P, Appendix 1.  20 C.F.R. § 404.1520(d),
404.1525, 404.1526, 416.920(d), 416.925 and 416.926.  (AR at pp.

---

[5] A cognitive disorder is a mental health disorder that
affects learning and memory.

16

15-16, ECF No. 14).

Fourth, the ALJ evaluated the medical evidence, Plaintiff's testimony, and other evidence in the record to determine Plaintiff's residual functional capacity.

The ALJ determined, based on the testimony and medical evidence, that Plaintiff has the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) and § 416.967(b), with the following limitations:

> [Plaintiff] can never climb ladders, ropes, or scaffolds; can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; must avoid hazards; is limited to simple, routine, repetitive, unskilled work tasks; and will be off-task up to 10% of the workday.

(AR at pp. 16-17, ECF No. 14).

Fifth, the ALJ found that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform given his age, education, work experience, and residual functional capacity. (Id. at pp. 21-23).

In this case, Plaintiff's appeal concerns the ALJ's decision regarding step five in the evaluation process.

The Plaintiff challenges the ALJ's determination that there is available work for Plaintiff that exists in significant numbers in the national economy.

**V.  Plaintiff Argues that the ALJ Erred in Denying his
     Applications Based on the Fifth Step in the Social Security
     Administration's Sequential Step Evaluation Process**

The Commissioner for Social Security Administration must

show that a claimant can perform some work that exists in

significant numbers in the national economy, taking into account

the claimant's residual functional capacity, age, education, and

work experience.  Tackett v. Apfel, 180 F.3d 1094, 1100 (9th Cir.

1999).  The Commissioner may satisfy this burden with testimony

of a vocational expert.  Osenbrock v. Apfel, 240 F.3d 1157, 1162

(9th Cir. 2001).

The vocational expert's testimony may constitute substantial

evidence of a claimant's ability to perform work which exists in

significant numbers in the national economy when the ALJ poses

hypothetical questions that accurately describe all of the

limitations and restrictions of the claimant that are supported

by the record.  Tackett, 180 F.3d at 1101; Magallanes v. Bowen,

881 F.2d 747, 756-57 (9th Cir. 1989).

ALJ's routinely rely on the Dictionary of Occupational

Titles issued by the United States Department of Labor "in

determining the skill level of a claimant's past work, and in

evaluating whether the claimant is able to perform other work in

the national economy."  Terry v. Sullivan, 903 F.2d 1273, 1276

(9th Cir. 1990).  The Dictionary of Occupational Titles is the

presumptive authority on job classifications.  Johnson v.

18

Shalala, 60 F.3d 1428, 1435 (9th Cir. 1995).

The ALJ determined, based on the testimony and medical evidence, that Plaintiff has the residual functional capacity to perform light work with limitations in climbing and restrictions in limiting his work to simple, routine, repetitive, unskilled tasks where he would be off-task up to 10% of the workday. (AR at pp. 16-17, ECF No. 14).

Plaintiff's past relevant work included work as a handyman/construction worker and a janitor. (Id. at pp. 17-18, 21). The ALJ found that Plaintiff's residual functional capacity would prevent him from engaging in his past work. (Id. at p. 21).

The ALJ posed a hypothetical to the vocational expert regarding the type of other work a person with Plaintiff's residual functional capacity could perform. The ALJ posed the following hypothetical to the vocational expert:

> I'm going to ask you to assume an individual of the claimant's age, education, and past work, who is able to lift and carry ten pounds frequently, 20 pounds occasionally, can sit for six hours in an eight-hour day, stand/walk for six hours in an eight-hour day, can never climb ladders, ropes, scaffolds, can occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl. The individual should avoid all hazards, and is limited to simple, routine, repetitive, unskilled work.

(AR at p. 49, ECF No. 14).

The vocational expert testified that a person with such a residual functional capacity could perform work in the following

three positions:

> **(1)  Assembler of Small Products**, Dictionary of Occupational Titles Code 706.684-022, with around 820 jobs in the local economy and at least 1,600,000 in the national economy;
>
> **(2)  Inspector**, Dictionary of Occupational Titles Code 559.687-074, with around 520 jobs in the local economy and 2,600,000 in the national economy; and,
>
> **(3)  Marker**, Dictionary of Occupational Titles Code 209.587-034, with around 420 jobs in the local economy and 1,100,000 in the national economy.

(AR pp. 49-50, ECF No. 14).

The ALJ asked if a person with the same limitation but was also limited in exertional capacity to "sedentary" could perform work in the economy. (Id. at p. 50). The vocational expert testified that a person with such a residual functional capacity could perform work as a Bench Hand Assembler, Table Worker, or Surveillance Monitor. (Id.)

Plaintiff challenges the ALJ's decision at step five of the evaluation process on three grounds.

First, Plaintiff argues that the ALJ erred by failing to ask the vocational expert if he could perform the jobs by being off-task for ten percent of the workday.

Second, Plaintiff asserts that the ALJ did not question the vocational expert if her testimony conflicted with the Dictionary of Occupational Titles.

Third, Plaintiff claims that the ALJ did not provide clear and convincing reasons for rejecting the clinical psychologist's

opinion that Plaintiff could not work.

### A.   The ALJ's Hypothetical Adequately Incorporated Plaintiff's Limitations in Being Off-Task During the Workday

The vocational expert's testimony may constitute substantial evidence of a claimant's ability to perform work which exists in significant numbers in the national economy when the ALJ poses hypothetical questions that accurately describe all of the limitations and restrictions of the claimant that are supported by the record.  Tackett, 180 F.3d at 1101; Magallanes, 881 F.2d at 756-57.

Plaintiff asserts that the ALJ erred because she did not adequately inquire with the ALJ about the time that an individual could be off-task for each of the jobs that the vocational expert had identified that Plaintiff could perform.  (Opening Brief at p. 10, ECF No. 17).

The ALJ was not required to conduct such an inquiry with the vocational expert.  Here, the ALJ properly posed hypothetical questions to the vocational expert concerning the limitation that Plaintiff would need to be off-task for a maximum of ten percent of the workday.

The record demonstrates that the ALJ properly formed her hypothetical question to the vocational expert concerning the percentage of time that such a claimant would be off-task.  The

ALJ asked the vocational expert about jobs available for someone with Plaintiff's residual functional capacity and inquired as follows:

> ALJ: Okay.  I'm just going to ask in your opinion what the tolerances are for an individual being off task throughout the workday outside of the normal breaks.
>
> VE: **Ten percent off task is the maximum.**
>
> ALJ: So if an individual is off task less than ten percent would the individual be able to perform the jobs that you testified to?
>
> VE: Yes.

(AR at pp. 50-51, ECF No. 14) (emphasis added).

It was sufficient for the ALJ to inquire if the jobs that were specified by the vocational expert could be performed if the claimant was off-task a maximum of ten percent of the time.

In the written decision, the ALJ stated:

> In all, I believe that the claimant's poor memory, his alleged borderline intelligence, his poor processing and alleged poor memory warranted a limit to simple, routine, repetitive, unskilled work tasks, and the need to be off-task for the workday. However, no greater limits are warranted, in light of the fact that the claimant clearly remembers what he used to do and stated that he probably could still do it but for his dizziness, which, for reasons cited above, it not work-preclusive.

(AR at p. 21, ECF No. 14).

The ALJ's hypothetical adequately incorporated Plaintiff's limitation as to the percentage of time spent off-task.  The ALJ properly relied on the vocational expert's testimony that Plaintiff could perform the jobs as a small products assembler,

22

inspector, and marker.  <u>Thomas v. Barnhart</u>, 278 F.3d 947, 956
(9th Cir. 2002) (holding that the ALJ's hypothetical adequately
incorporated the claimant's limitation on concentration,
persistence, and pace).

   **B.   The ALJ Properly Inquired of the Vocational Expert
         Whether a Conflict Existed Between Her Testimony and
         the Dictionary of Occupational Titles**

   Social Security Ruling 00-4p states that when a vocational
expert provides evidence to the ALJ about the requirements of a
job or occupation, the ALJ has an affirmative responsibility to
ask about any possible conflict between the vocational expert's
evidence and information provided in the Dictionary of
Occupational Titles.  S.S.R. 00-4p, 2000 WL 1898704 (2000).  SSR
00-4p further provides that the ALJ will ask the vocational
expert if the evidence provided is consistent with the Dictionary
of Occupational Titles and obtain a reasonable explanation of any
apparent conflict.  <u>Id.</u>

   The Ninth Circuit Court of Appeals held in <u>Massachi v.
Astrue</u>, 486 F.3d 1149, 1152-53 (9th Cir. 2007) that Social
Security Ruling 00-4p requires the ALJ to inquire of the
vocational expert whether the expert's testimony conflicts with
the presented evidence from the Dictionary of Occupational
Titles.

   Here, the ALJ did inquire of the vocational expert if her

testimony conflicted with the jobs she cited in the Dictionary of Occupational Titles.

The ALJ posed hypothetical questions to the vocational expert concerning the Plaintiff's residual functional capacity. (AR at pp. 49-50, ECF No. 14).  The vocational expert identified a number of jobs that someone with Plaintiff's residual functional capacity could perform, including small products assembler, inspector, and marker.  (Id.)  The vocational expert provided testimony as to the jobs stated in the Dictionary of Occupational Titles that Plaintiff could perform, and the ALJ inquired as follows:

> ALJ: I'm going to give you a couple of hypotheticals.  I'm going to ask you to assume an individual of claimant's age, education, and past work, who is able to lift and carry ten pounds frequently, 20 pounds occasionally, can sit for six hours in an eight-hour day, stand/walk for six hours in an eight hour day, can never clime ladders, ropes, scaffolds, can occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl. The individual should avoid all hazards, and is limited to simple, routine, repetitive, unskilled work.  Can such an individual perform any of the claimant's past work?
>
> VE:  No, Your Honor.
>
> ALJ: Was that no?
>
> VE:  That was no, Your Honor.
>
> ALJ: Are there other jobs in the national economy that such an individual can perform?
>
> VE:  At the light exertional level, SVP 2 or lower, unskilled work, some samples would be assmbler of small products, DOT number 706.684-022.  There's 1,600,000 in the U.S., and 820 in Hawaii.

Inspector is DOT number 559.687-074.  There's 2,600,000 in the U.S., and 520 in Hawaii.

And marker is DOT number 209.587-034.  There's 1,100,000 in the U.S., and 520 in Hawaii.

ALJ:  Is your testimony consistent with the [Dictionary of Occupational Titles]?

VE:  Yes, Your Honor.

(AR at p. 50, ECF No. 14).

Following this exchange, the ALJ continued to inquire with the vocational expert about the percentage of time that an individual could be off-tasks for those positions.

Plaintiff argues that the ALJ was required to ask if the positions identified by the vocational expert conflicted with the requirement that the individual be off-task a maximum of ten percent of the time.  (Opening Brief at p. 13, ECF No. 17).  Such an inquiry was not required.  The ALJ properly asked if there was any conflict between the vocational expert's testimony and the Dictionary of Occupational Titles.  The ALJ was not required to ask about any potential conflict concerning the time that the claimant would be off-task with the Dictionary of Occupational Titles because such limitations are not included in the Dictionary of Occupational Titles.

Courts have recognized that the Dictionary of Occupational Titles does not address mental limitations such as persistence, pace, concentration, or other non-exertional limitations. Arellano v. Colvin, 2016 WL 3031770, *6 (C.D. Cal. May 25, 2016)

25

(citing <u>Fleener v. Colvin</u>, 2015 WL 5521992, at *6 (D. Or. Sept. 15, 2015)).  The Dictionary of Occupational Titles does not "expressly address what percentage of the workday or workweek an employee must be on-task". <u>Smith v. Colvin</u>, 2016 WL 3456906, *2 (C.D. Cal. June 22, 2016).

Here, the three positions identified by the vocational expert do not state limitations for time that must be performed on-task.  The ALJ was allowed to rely on the vocational expert's testimony that there was no conflict between the DOT and the three positions listed by the vocational expert.  A vocational expert's expertise provides the necessary foundation for his or her testimony and no additional foundation is required for the ALJ to rely on his or her testimony.  <u>Bayliss v. Barnhart</u>, 427 F.3d 1211, 1218 (9th Cir. 2005).

District Courts have routinely found that there is no conflict between the vocational expert's testimony and the Dictionary of Occupational Titles when the vocational expert testifies that the claimant can perform a job even if the claimant will be off-task for a maximum of ten percent of the time.  <u>See</u> <u>Arellano</u>, 2016 WL 3031770, at *6; <u>Gordon v. Colvin</u>, 2015 WL 685396, at *7 (C.D. Cal. Feb. 17, 2015); <u>Lea v. Colvin</u>, 2015 WL 997863, at *6 (D. Ariz. Mar. 5, 2015).

In <u>Calvey v. Astrue</u>, 2013 WL 180033, *6 (C.D. Cal. Jan. 17, 2013), the District Court found that there was no conflict

between the Dictionary of Occupational Titles and the vocational expert's testimony that the claimant could perform the position of a housekeeper despite the limitation of being off-task ten percent of the time.  Id.

The written decision in this case is clear that the ALJ found that"the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles." (AR at p. 22, ECF No. 14).  There was no error in the ALJ's reliance on the vocational expert's testimony that there was no conflict with the Dictionary of Occupational Titles and that Plaintiff could work as a small products assembler, inspector, and marker.

### C.   The ALJ Did Not Err in Declining to Credit the Conclusions of the Clinical Psychologist

Plaintiff argues that the ALJ erred because she did not provide sufficient reasons for rejecting some of the conclusions of Clinical Psychologist Dennis Donovan, Ph.D.  (Opening Brief at p. 14, ECF No. 17).

On May 3, 2013, Dr. Donovan performed a consultative psychological examination of Plaintiff.  (Plaintiff's Psychological Evaluation, AR at pp. 353-358, ECF No. 14).  The cognitive testing determined that Plaintiff was in the borderline range of intellectual functioning and indicated that Plaintiff had limitations in his memory, processing speed, and verbal

comprehension.  (AR at pp. 356-57, ECF No. 14).

The report indicated that Plaintiff's appearance was "largely unremarkable" and his "level of psychomotor activity was within normal limits. [Plaintiff] showed no evidence of fine or gross motor problems."  (Id. at p. 353).  The summary of the report's conclusions stated, as follows:

> 1.  I don't think William can handle his own financial affairs.  I think he would benefit from assistance, as he has very poor memory.
>
> 2.  I think William can understand simple oral instructions, although he may not necessarily remember them later on.
>
> 3.  I don't think William can maintain normal pace, persistence, concentration in the workplace.  He is forgetful and he also reports easy distractability.
>
> 4.  I think William can handle the stress of low-stress employment and get along with others, but I do not think that he can keep up with the work pace.  While he indicates that he gets mad more easily, he also tended to minimize the importance of this and states that he just walks away if something upsets him.  I suspect this is what would happen in a workplace when given expectations beyond his capacities.

(AR at p. 358, ECF No. 14).

The ALJ afforded significant weight to some of the findings of Dr. Donovan.  The ALJ stated, as follows:

> Dr. Donovan's opinion is afforded significant weight to the extent that it is consistent with the documented objected evidence and my opinion as to the claimant's limitations.  However, in light of the claimant's relatively full activities of daily living, including his ability to handle his finances, I cannot accept Dr. Donovan's opinion that the claimant cannot handle his finances or that he cannot handle the pace of work because he walks away from his work when things are

bad. Not only if this opinion contradicted by the claimant's abilities, as mentioned above, there is little to no evidence that the claimant has ever walked away from a job when things are bad. If this were the case, the claimant presumably would not have been able to have performed the work he performed for several years. Further, there is no evidence the claimant's alleged tendency to walk away arose after he stopped working.

(AR at p. 21, ECF no. 14).

The ALJ properly rejected Dr. Donovan's conclusions that Plaintiff cannot manage his own financial affairs, Plaintiff cannot handle a normal work pace, and Plaintiff will walk away from work.

The ALJ properly discounted Dr. Donovan's conclusions that were based solely on the Plaintiff's own allegations. The ALJ may discredit a treating physician's opinion that is premised solely on a claimant's own report. Fair v. Bowen, 885 F.2d 597, 602-03 (9th Cir. 1989). The ALJ properly discredited Dr. Donovan's conclusions concerning the persistence and severity of Plaintiff's limitations because it conflicted with Plaintiff's own testimony about his participation in everyday activities. Hensley v. Colvin, 600 Fed. Appx. 526, 527 (9th Cir. 20015) (the ALJ properly rejected a physician's opinion that was inconsistent with the claimant's reported participation in daily activities); Molina v. Astrue, 674 F.3d 1104, 1113 (9th Cir. 2012) (citing Morgan v. Comm'r Soc. Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999)).

29

The ALJ reasonably relied on the Plaintiff's testimony and documentary evidence that Plaintiff is able to engage in a wide range of daily activities including personal grooming, shopping, doing laundry, going for walks, and doing crossword puzzles.  (AR at pp. 20-21, 220-22, 245-248, 355, ECF No. 14).  Evidence in the record demonstrated that Plaintiff has continually stated that he is able to pay bills, count change, and use an EBT card to manage his finances.  (Plaintiff's Applications for Disability Insurance and Supplemental Security Income Benefits, AR at pp. 222, 247; Plaintiff's Psychological Evaluation, AR at p. 355, ECF No. 14).

The ALJ properly found that there was no evidence in the record demonstrating that the Plaintiff has ever walked away from work because he was upset or that he was unable to work well with others.  (AR at p. 21, ECF No. 14).  An ALJ may properly reject a claimant's self-reported claim that he cannot work with others when it is not supported by sufficient evidence in the record. Turner v. Comm'r Soc. Sec., 613 F.3d 1217, 1225 (9th Cir. 2010).

Objective evidence in the record conflicted with Dr. Donovan's conclusions about Plaintiff's limitations in terms of memory, concentration, persistence, and pace and the ALJ properly declined to rely on Dr. Donovan's conclusions.  Mayes v. Massanari, 276 F.3d 453, 461 (9th Cir. 2001).

The ALJ credited the objective medical evidence in the record, particularly Plaintiff's treating medical physician's

reports.  (AR at pp. 18-21, ECF No. 14).  The ALJ relied on
medical records that repeatedly found that Plaintiff had normal
mental status evaluations conducted by his treating physicians.
(AR at pp. 19, 339, 343, 362, 428).  The medical records of the
treating physicians reflected that Plaintiff was "alert and well
oriented with clear speech and normal language." (AR at pp. 343,
362, 428).  Plaintiff's treatment records reflected that
Plaintiff consistently participated in interactive discussions
with his health care providers with no reported limitations in
his ability to pay attention or understand directions.  (AR at
pp. 339, 342, 345, 361, 369, 427).

The ALJ properly relied on the objective evidence and
declined to credit the conclusions of Dr. Donovan that were based
on the Plaintiff's self reporting.  Plaintiff's credibility was
placed into question based on his own failure to pursue treatment
for his pain and sleep issues.  An unexplained failure to seek
treatment or follow a prescribed course of treatment can support
an ALJ's credibility determination.  Fricke v. Astrue, 2012 WL
2395178, *7 (W.D. Wash. June 25, 2012) (citing Fair, 885 F.2d at
603).

Plaintiff's treating physicians found that he failed to show
up to appointments, refused to have blood work or other
laboratory and diagnostic testing performed, and routinely
refused medication.  (AR at pp. 348, 352, 359, 361, 369, 427,

31

435, ECF No. 14).

The ALJ asked Plaintiff about his refusal to take medication to treat his pain and Plaintiff did not provide a reasonable answer.  The ALJ inquired as follows,

> ALJ: Okay.  Let me ask you, it looks like the doctors have recommended medication for your headache.  They've also recommended a bunch of treatment, injections for your headache.  They wanted to do a sleep study, but you decided not to do those things.  Can you tell me why not?

> Pla: It's not – – I think it has nothing to do with my sleeping.  It's either my neck or my jaw.

> ALJ: And why – -- they've recommended some medications for your neck, for your jaw, for your headaches, but you've said no, I don't – –

> Pla: They wanted to try to see what medication will work for me, make an experiment out of me.  I don't know.

(AR at p. 39).

Dr. Devere repeatedly informed Plaintiff that his pain could be treated with nortriptyline but Plaintiff refused to take it. (AR at pp. 361 427).  In situations where medication has been shown to be effective but the patient refuses to avail himself of the treatment offered, that fact alone allows a determination that the impairments that could be so treated are not disabling. Blackwell v. Colvin, 2016 WL 4702823, *5 (E.D. Cal. Sept. 7, 2016) (citing Warre v. Commissioner, 439 F.3d 1001, 1006 (9th Cir. 2006)).

The Court has reviewed the entire record and finds that there is substantial evidence to support the ALJ's decision.

## CONCLUSION

The Commissioner of Social Security Administration's decision is **AFFIRMED**.

The Clerk of Court is Ordered to **CLOSE THE CASE**.

IT IS SO ORDERED.

DATED: November 15, 2016, Honolulu, Hawaii.



_____
Helen Gillmor
United States District Judge

William Q. Diesta v. Carolyn W. Colvin, Social Security
Administration Commissioner; Civ. No. 15-00465 HG-KSC; **ORDER
AFFIRMING THE DECISION OF THE SOCIAL SECURITY ADMINISTRATION
COMMISSIONER**